Deposition of: Roger Sarenpa
*Taken: February 3, 2005*

**Page 8**

1  A   Well, I think she wanted to be married to an alcoholic,
2      and I wasn't an alcoholic.
3  Q   Okay, and was she an alcoholic?
4  A   No.
5  Q   Why do you think she wanted to be married to an
6      alcoholic?
7  A   Why do I think that.
8  Q   Yes.
9  A   Why do I think that. I don't know. That's just what I
10     think.
11 Q   Okay. What was her stated position?
12 A   Her stated position. Well, she certainly said a lot of
13     bad things about me. You mean why did she state that she
14     wanted the divorce?
15 Q   Exactly.
16 A   I don't remember.
17 Q   All right. You mentioned that you had a history with an
18     alcohol problem?
19 A   Uh-huh.
20 Q   When was that?
21 A   My dry date was 1-17-77, and I started drinking I guess
22     in high school.
23         MR. LARSON: Just one thing for the court
24     reporter's sake, and I'll probably remind you of this a
25     couple of times. Court reporters always say they can't

**Page 9**

1      get uh-huhs. You have to say yes.
2          THE WITNESS: Okay.
3          MR. GREENMAN: Thank you, counsel.
4  BY MR. GREENMAN:
5  Q   In terms of the alcohol problem, did you go through
6      treatment?
7  A   No.
8  Q   Did you go to college?
9  A   No.
10 Q   Did you graduate from high school?
11 A   Yes.
12 Q   When did you graduate from high school?
13 A   I always have to think about that, because I didn't
14     graduate with my class, I had to go on the work program,
15     so I guess it would have been '64.
16 Q   Okay, and how many years total did it take you from the
17     time you started high school to the time you completed it
18     or graduated?
19 A   Just high school?
20 Q   Right.
21 A   Three and-a-half.
22 Q   So you graduated early?
23 A   No. Late, half a year after I should have.
24 Q   Okay, so you went one semester extra than the typical
25     four years of high school.

**Page 10**

1  A   Yes.
2  Q   And did you go to work after you graduated from high
3      school?
4  A   Yes.
5  Q   Where did you go to work?
6  A   For my father, Thomas & Associates.
7  Q   And what is Thomas, or what was Thomas & Associates?
8  A   Screen printing company.
9  Q   And what did you do for them?
10 A   Well, I started out kind of at the bottom, acclimating
11     sheets, and then started printing and die cutting.
12 Q   You gradually worked your way up?
13 A   Yeah, yeah.
14 Q   Did you ever consider going to college?
15 A   No.
16 Q   Did you have -- what was your grade point average in high
17     school?
18 A   Don't remember.
19 Q   Did you get mostly As, mostly Bs, mostly Cs?
20 A   Sorry, don't remember.
21 Q   Were you a good student?
22 A   No.
23 Q   Why is it that you never gave college any thought?
24 A   I didn't like school.
25 Q   Had you had discussions with your dad about going to work

**Page 11**

1      for him after high school?
2  A   No.
3  Q   Did you work for him at any time prior to the time you
4      graduated from high school?
5  A   Yes.
6  Q   Full-time or part-time basis?
7  A   Yes.
8  Q   Which one?
9  A   Both.
10 Q   When did you first start working for your dad?
11 A   I think 1964.
12 Q   That was the year you graduated from high school?
13 A   Well, then I didn't graduate in '64, then it was '65.
14 Q   So if I understand your testimony correctly, if my math
15     is right, you worked for him either on full-time or
16     part-time capacity for about a year and-a-half before you
17     formally graduated from high school.
18 A   Yes.
19 Q   Did you work for him part-time while you were in school
20     and full-time during the summer and on breaks?
21 A   I don't remember.
22 Q   What happened to Thomas & Associates?
23 A   I changed the name to Express Image after I bought out my
24     dad's partner.
25 Q   Who was your dad's partner?

Deposition of: Roger Sarenpa
*Taken: February 3, 2005*

**12**

1  A  Don Raddatz.
2  Q  Can you spell the last name, please?
3  A  R-a-d-d-a-t-z.
4  Q  And when did you buy out your dad's partner?
5  A  1982.
6  Q  Prior to 1982, I assume you had acquired your father's
7     interest in the business?
8  A  No.
9  Q  Can you explain to me how that worked. When did you
10    become complete owner? You bought out your dad at one
11    point. Tell me how that came about.
12 A  We hadn't gotten there yet. I bought out my dad in 1990.
13 Q  Oh, I see. So you bought out your dad's partner, and you
14    and your father in essence were partners --
15 A  Yes.
16 Q  -- for eight years, until you then bought your father's
17    shares.
18 A  Yes.
19 Q  Did the business itself essentially stay the same over
20    time, the type of thing that you produced?
21 A  Yes.
22 Q  Over the years when you were working either, you know,
23    working for your father, were there talks of
24    successorship with you taking over some day?
25 A  No.

**13**

1  Q  Not once?
2  A  Not once.
3  Q  So how did you happen to buy out your dad's partner?
4     Where did you get the capital?
5  A  I had it in a profit sharing plan.
6  Q  How much did you pay your dad's partner?
7  A  30,000.
8  Q  And how much did you pay your father?
9  A  100,000.
10 Q  Did you just assume all along that you were going to
11    spend your career at Express Image?
12 A  No.
13 Q  At some point, did you come to that conclusion?
14 A  Oh, you mean after I bought it?
15 Q  No, before you bought it.
16 A  No.
17 Q  Between 1965 and 1982, did you develop any skills that
18    you thought were readily transferrable to other
19    companies?
20 A  Other screen printing companies.
21 Q  Did you think that your options were in any way
22    comparable if you had left Express Image and gone
23    somewhere else, or Thomas & Associates?
24 A  Well, before I bought out my dad's partner, I had plans
25    of starting my own business.

**14**

1  Q  Another printing business?
2  A  Yes.
3  Q  During the 17 years that you, approximately 17 years that
4     you were working there before buying out your dad's
5     partner, did you think you had any realistic options
6     outside of either working for Thomas & Associates or
7     starting your own business?
8  A  I don't remember.
9  Q  When you bought out your dad's partner, did you have the
10    intention of buying out your father at some point?
11 A  I don't remember.
12 Q  Between 1982 and 1990, how many discussions would you
13    think that you had with your dad about buying him out
14    some day?
15 A  None.
16 Q  None. So how did you present the offer of $100,000 to
17    buy out his portion of the business?
18 A  Well, we must have talked about it.
19 Q  That's what I'm getting at.
20 A  I don't remember it.
21 Q  I mean, you didn't all of a sudden one day come and
22    spring it on him and say, dad, I want to buy you out,
23    here's my offer. You would think that there would have
24    been discussions about it prior to that, right?
25 A  There would have had to have been.

**15**

1  Q  That makes sense, doesn't it?
2  A  Yeah.
3  Q  How many, over the years, since Jeff has been working for
4     you or working at Express Image, how many discussions
5     would you say that you've had with him about him taking
6     over the business some day?
7  A  It's pretty hard to put a number on it.
8  Q  A lot?
9  A  Relative to what?
10 Q  Well, I mean, say it's been about 20 years, hasn't it, a
11    little more than that?
12       MR. CALDECOTT: Well, 1990 to 2005 is not 20
13    years.
14 BY MR. GREENMAN:
15 Q  Well, Jeff went to work for the business prior to 1990,
16    right?
17 A  Right.
18 Q  So over the 20 plus years that Jeff has worked there,
19    would you say that the topic has been broached at least
20    20 times?
21 A  Are you looking for me to guess?
22 Q  I want just a ballpark figure about how many times it's
23    been discussed, like between ten and 20, between 20 and
24    30, between 100 and 200?
25 A  Between ten and a hundred.

*Deposition of: Roger Sarenpa*
*Taken: February 3, 2005*

## Page 24

1  there.
2  Q  Emphasize morals?
3  A  Pardon me?
4  Q  Emphasize morals?
5  A  Moral values, definitely, no lying or stealing or
6     cheating. I'd say the golden rule would be a good one.
7  Q  During the last six months of Steve's employment, how
8     many times did you call him a sinner?
9  A  Zero, none.
10 Q  How many times did you tell him he was committing a sin?
11 A  None.
12 Q  How many times did you tell him he was breaking a
13    commandment?
14 A  None.
15 Q  How many times did you tell him that he would learn from
16    your mistakes?
17 A  Once.
18 Q  When was that?
19 A  He and I had a -- when? May 23, 2003. I have no idea.
20    That's, I'm sorry, that's sarcastic. I don't know when
21    it was.
22 Q  In what context did it arise?
23 A  He was in my office, and we were just having a
24    conversation.
25 Q  What was the conversation?

## Page 25

1  A  I had told him about the, with regard to the affair that
2     I had had and that I thought, told him that I had learned
3     that it was -- it didn't give me what I thought it would
4     and that it was very hurtful to a lot of people and that
5     it put my business in danger, and that I thought it was
6     the same thing as what he was doing.
7  Q  Did you tell him that he will learn from your mistakes?
8  A  How could I -- no, no.
9  Q  How many times did you tell him that he needed to repent?
10 A  Never.
11 Q  And after Steve resigned and he wanted to come back, you
12    told him that you weren't going to hire him back, because
13    this was his penance, right?
14 A  Never.
15 Q  Going back to June of 2003, I want you to tell me how you
16    learned about the kissing incident.
17 A  I witnessed it.
18 Q  Tell me where you were and how you happened to witness
19    it.
20 A  It was right in front of my office window.
21 Q  So a car pulls up. What happens? Tell me what you saw.
22 A  Oh, what I saw. I saw Steve and Holly in the front seat
23    and Zack Koosman in the back seat. I saw Steve kissing
24    Holly. They kissed two times.
25 Q  Okay. Was there anyone else present in the vicinity,

## Page 26

1     other than Zack?
2  A  No, but my window is narrow and that's --
3  Q  Was there anybody else in your office at the time?
4  A  No.
5  Q  What did you do after you witnessed this?
6  A  I think I sent Mary an e-mail.
7  Q  Did you talk to anybody?
8  A  And then I called Bob Ryan.
9  Q  How soon after the incident did you call Bob Ryan?
10 A  I don't remember.
11 Q  Within the hour?
12 A  I'd say the same day.
13 Q  Same day? Who is Bob Ryan?
14 A  Bob Ryan owns, well, used to be Skill Share, now it's
15    About Purpose. I first met him when I joined a group of
16    five or six other business owners. He was the
17    facilitator of that group, and then previously, or
18    subsequent to that, he was like a business coach, a
19    consultant, and I talked to him several times.
20 Q  What qualifications does he have to be a business
21    consultant?
22 A  What qualifications? A knowledge of business and
23    training, some sort of a degree.
24 Q  Why did you call Bob Ryan?
25 A  At that point on the --

## Page 27

1  Q  Yes, on the same day.
2  A  To get some advice.
3  Q  Why did you feel you needed advice?
4  A  Because I had a sense that this could be a dangerous
5     thing. I mean, when -- there are murders that take place
6     when married people bring their other person in contact
7     with their spouse, love triangle, whatever you want to
8     call it. It just seemed like a dangerous thing to me.
9  Q  Did you believe that Steve was keeping it a secret that
10    he was in a relationship with Holly?
11 A  Obviously not.
12 Q  Did you know Jenny to have any violent tendencies?
13 A  No.
14 Q  Do you know, does Jenny own a gun?
15 A  I have no knowledge.
16 Q  Do you think that Jenny would be capable of causing Holly
17    or Steve bodily harm?
18 A  I don't know.
19 Q  Have you ever known Jenny to strike anybody?
20 A  No.
21 Q  Okay. Why else did you call Bob Ryan?
22 A  I think that's enough.
23 Q  Well, were there any other reasons, other than just
24    limited to the fact that it was a dangerous situation?
25 A  Dangerous would also include what he termed, the phrase

*Deposition of: Roger Sarenpa*
*Taken: February 3, 2005*

### Page 28

1 he used is opening our company up for a possible hostile
2 work environment lawsuit.
3 Q  Is Bob Ryan a lawyer?
4 A  No.
5 Q  Did you talk to a lawyer after he said that?
6 A  Yes. I talked to my lawyer.
7 Q  Who was that?
8 A  Craig Greenberg.
9       THE WITNESS: Oh, oh.
10      MR. LARSON: We don't object. There is no
11 communication being asked, I don't think.
12      MR. GREENMAN: And by the way, we're going
13 to have one attorney defending the deposition, and I
14 assume that's going to be you, since you're sitting
15 there.
16      MR. LARSON: That would be me.
17      MR. CALDECOTT: If I want to call attention
18 to my co-counsel about something by looking at him or
19 clearing my throat or passing him a note, I'll do that;
20 and if you're aware of a case that says that I can't do
21 that, please let me know.
22      MR. GREENMAN: You can pass all the notes
23 you want. You're just not going to participate in
24 defending the deposition.
25

### Page 29

1 BY MR. GREENMAN:
2 Q  Did you --
3      MR. LARSON: What was the last -- I lost
4 track. Oh, the last question is was the response --
5      MR. GREENMAN: Who was the lawyer.
6      MR. LARSON: Okay. Go ahead. You can
7 answer that, who the lawyer was.
8      MR. GREENMAN: Craig Greenberg.
9      MR. LARSON: Oh, okay.
10 BY MR. GREENMAN:
11 Q  Is he with a firm?
12 A  Yes.
13 Q  What firm?
14 A  Huffman, Usem, Crawford, Saboe & Greenberg.
15 Q  Did you hire Mr. Greenberg with respect to the situation
16    with Steve?
17 A  Did I hire him.
18      MR. LARSON: I guess you can answer that.
19      THE WITNESS: Well --
20      MR. LARSON: If you can.
21      THE WITNESS: He is my company lawyer. Any
22 time, I assume any time I call him on the phone, I'm
23 hiring him, because I get a bill in the mail, but I
24 didn't specifically --
25

### Page 30

1 BY MR. GREENMAN:
2 Q  As you should.
3      MR. CALDECOTT: That is the acid test
4 whether you hired somebody.
5      (Discussion off the record.)
6 BY MR. GREENMAN:
7 Q  Did Bob Ryan explain why he thought this in any way could
8    be sexual harassment or hostile work environment?
9 A  Yes.
10 Q  What did he say?
11 A  He said that if an employee that Steve was supervising
12    were to witness that --
13 Q  That being what?
14 A  The kissing incident. That that, as a supervisor -- it's
15    a little hard to remember. But as a supervisor, the
16    employees learn by example what they see their supervisor
17    doing. There is a certain responsibility there that
18    would be inherent in that job. So there could also be,
19    if Jenny had witnessed that, she could possibly sue the
20    company for my allowing my son to be engaging in
21    something like that on company property.
22 Q  Something like what?
23 A  Kissing this woman other than his wife.
24      MR. LARSON: Could I interrupt for just a
25 second on a disclosure issue?

### Page 31

1      MR. GREENMAN: Yes.
2      MR. LARSON: Mr. Ryan did generate a report,
3 and I just want to check to make sure you got it.
4      MR. GREENMAN: I got it.
5      MR. LARSON: Okay, good.
6      MR. GREENMAN: I'm not going to go into that
7 in great detail.
8      THE WITNESS: Is it possible to have a break
9 to talk to my lawyer?
10      MR. GREENMAN: Sure.
11      (Brief recess taken.)
12 BY MR. GREENMAN:
13 Q  So we've established that you knew when the kissing
14    incident took place that Steve was not living with Jenny,
15    right?
16 A  We have not.
17 Q  We have not what?
18      MR. CALDECOTT: No question along those
19 lines has been asked at all.
20      MR. GREENMAN: He said it wasn't a secret.
21 Counsel, I'd ask that again only one person defend the
22 deposition.
23 BY MR. GREENMAN:
24 Q  You said it wasn't a secret that he was in a relationship
25    with Holly, correct?

**32**

1  A  Yes.
2  Q  And so you knew at the time that he was not living with
3     Jenny.
4  A  No.
5  Q  You didn't know that.
6  A  No, I didn't.
7  Q  How did you know that Steve was having a relationship
8     with Holly in June?
9  A  How did I know it. Well, for one thing, I saw him
10    kissing her in the parking lot.
11 Q  Okay. That's the first time you'd ever seen her?
12 A  That's the first time I ever saw her, yes.
13 Q  Had you known her name prior to that date?
14 A  Yes.
15 Q  How did you know her name?
16 A  I heard people mention her name, heard people mention it,
17    yeah.
18 Q  Including your wife, right?
19 A  Yes.
20 Q  And you knew that Jenny and Mary were e-mailing all the
21    time about Jenny and Steve and Holly and issues like
22    that, right?
23 A  I don't think so at that time.
24 Q  Well, was there a time that you became aware that Jenny
25    and Mary were e-mailing extensively concerning Steve and

**33**

1     Jenny?
2  A  Yes, and Steve.
3  Q  And when was that?
4  A  When?
5  Q  Yeah.
6  A  I don't recall.
7  Q  So your big problem was that he was kissing someone who
8     was not his wife while he was still married to Jenny.
9        MR. LARSON: If that states what you
10       testified to.
11       THE WITNESS: No.
12 BY MR. GREENMAN:
13 Q  Then what was the problem?
14 A  That he was doing it on company property in the sight
15    of -- the smoking crew were down here 50 feet from where
16    it took place.
17 Q  Yeah, so what? What's the big deal?
18 A  Well, as a business owner, I sometimes get a sense that
19    this could be dangerous, but I think the biggest thing
20    came from the report from Bob Ryan. As my business
21    adviser, I pay him, so I sure better listen to him.
22 Q  You're free, aren't you, to follow or not follow any
23    advice that somebody gives you, correct?
24 A  Yes.
25 Q  Decision is ultimately yours, correct?

**34**

1  A  Yes.
2  Q  Bob Ryan didn't make any decisions, did he?
3  A  He what?
4  Q  He just made recommendations, he didn't make any
5     decisions, right?
6  A  Right.
7  Q  And you were free to either implement or disregard those
8     recommendations, weren't you?
9  A  Yes.
10 Q  Did you review Bob Ryan's recommendations with an
11    attorney?
12 A  Yes.
13 Q  Mr. Greenberg?
14 A  Yes. Can I ask my lawyer a question?
15 Q  There is not a question pending, so yeah.
16       (Brief time off the record.)
17       MR. LARSON: Although, now that you mention
18    it, I did do -- there is a letter from Mr. Greenberg
19    about this situation. It's, again, attorney-client
20    privilege, and I probably should have identified that
21    when I was identifying the other privilege documents.
22       MR. GREENMAN: Okay. I appreciate that.
23    And you're not going to be using that as evidence in this
24    case.
25       MR. LARSON: No, no.

**35**

1  BY MR. GREENMAN:
2  Q  Now, have we exhausted all the reasons why you thought
3     that this was any of your business, the kissing incident?
4  A  Anything that takes place on my, within my company, on my
5     property, I'd say I better make it my business.
6  Q  Have you now told me all the reasons why you thought it
7     was your business?
8  A  Yes.
9  Q  Putting Steve's situation aside, the company doesn't have
10    a policy against a girlfriend kissing an employee while
11    dropping them off at work, right?
12 A  No.
13 Q  There would be nothing wrong with that, right?
14 A  Right.
15 Q  And it was only the fact that Steve was married to Jenny
16    at the time that made his situation different, right?
17 A  Yes.
18 Q  And if Steve was no longer married to Jenny, for
19    instance, then he would be in the same boat as just a
20    regular employee whose girlfriend is dropping him off at
21    work, right?
22 A  I expect that would be the case.
23 Q  Do you have a former employee named Randine working for
24    Express?
25 A  Could you rephrase that question?