## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEVEN SARENPA, | Civil No. 04-1538 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| EXPRESS IMAGES INC., ROGER SARENPA, and MARY SARENPA, | |
| Defendants. | |

Mark A. Greenman and Ruth Y. Ostrom, **GREENMAN & OSTROM**, 301 Fourth Avenue South, Suite 270, Minneapolis, MN 55415, for plaintiff.

David W. Larson and Dawn M. Knutson, **MARTIN & SQUIRES**, 444 Cedar Street, Suite 2050, St. Paul, MN 55101, for defendants.

Defendant Express Images, Inc. is a second generation, family-run business owned by defendant Roger Sarenpa. Defendant Mary Sarenpa, Roger's wife, is the vice-president and Jeff Sarenpa, Roger's son, is the president. Plaintiff Steven Sarenpa, Roger's son and Mary's stepson, was the production manager. Steven brought suit against the company, Roger, and Mary alleging violation of Title VII based on religion and violation of the Minnesota Human Rights Act ("MHRA") based on marital status. The parties have filed cross motions for summary judgment. For the following reasons,

the Court grants in part and denies in part defendants' motion and denies plaintiff's motion.

## BACKGROUND

Roger and Mary are born-again Christians who admit to strongly held religious beliefs based on the Bible about marriage and adultery.  Roger and Mary have "dedicated the[ir] business to the Lord."  (Greenman Aff. Ex. CC.)  Steven is not religious.  The relationship between Steven and his father and stepmother has been strained for a number of years.

Plaintiff began an extramarital relationship with a woman, Holly Hamilton, in approximately 2001.  Over the next several years, Steven left his wife, Jenny, to live with Holly and then returned to Jenny on several occasions.  According to Steven, each time he left his wife, Roger and Mary reminded him that adultery is a sin and treated him poorly.  Each time he returned to his wife, Steven's relationship with Roger and Mary temporarily improved.  In late spring 2003, Steven again left his wife, intending to live with Holly permanently.

On June 9, 2003, Holly dropped Steven and another Express Images employee back at work after lunch.  Steven and Holly kissed goodbye.  Roger witnessed the kiss from his office window and became angry and upset.  In an email to Mary, Roger wrote: "I sat in my office as he was kissing her in the car outside my window – did not know what to do – wwjd." (Greenman Aff. Ex. CC.)  Roger called Express Images's business consultant, Bob Ryan, to discuss the incident.  Ryan offered the opinion that Steven's

behavior with Holly might undermine Steven's authority with the employees that he supervised and/or expose the company to harassment allegations.

On June 11, 2003, Steven met with Roger and Mary. According to Steven, Roger and Mary were very angry about the affair and told him that his relationship with Holly was a sin and that there was never a reason for adultery. Notes from the meeting indicate that Roger and Steven discussed various work-related issues involving Steven's marriage and relationship with Holly including "supervising x-wife," "repeatedly hiring and firing Jenny, bringing affair person to company, [and] kissing with affair person in plain view of personnel," "eroding ability to supervise people, [and] opening our company up to possible harassment/hostile work place lawsuits." (Greenman Aff. Ex. D.) The meeting ended with Roger demanding that Steven either take an indefinite leave of absence without pay to get "his life in order relative to business" or meet with Ryan. *Id.* Steven understood that his father was pressuring him to return to his wife by threatening to terminate him.

Steven met with Ryan, who recommended that Steven, Jeff, and Roger develop objective performance standards in order to ameliorate Steven's perception that he was being judged personally rather than professionally; that concrete plans for the eventual transfer of the business from Roger to Jeff and Steven be put in place in order to address Steven's concerns on that front; and that Steven be particularly careful to avoid any appearance of impropriety (particularly relating to his wife and Holly) around the work place until his divorce became finalized.

According to Steven, over the next several months, Roger and Mary called Steven to numerous meetings that began with general criticism of Steven's work performance but rapidly degenerated into Roger and Mary yelling at Steven that he was a sinner and adulterer, needed to repent, and should return to his wife.  Steven contends that Roger and Mary took every opportunity to remind him that his relationship with Holly was wrong, and that they invariably phrased their disapproval in religious terms.  According to defendants, several meetings were held to discuss Steven's performance at work.  The meetings involved yelling, and were unproductive, but did not touch on Steven's relationship except as it impacted the workplace.

Problems came to a head in late summer, when Mary learned that Holly had become pregnant.  On August 27th, a series of emails were exchanged between Mary, Holly, and Steven.  The emails make clear that Mary believes that Steven's and Holly's relationship is a sin and violates the Ten Commandments.  The email exchange began, apparently, in response to an email exchange between Mary and Jenny in which Mary expressed her support for Jenny and called Holly a "pregnant bimbo."  Steven learned of these emails by logging into Jenny's personal email account and reading the email between Jenny and Mary.

On August 28th, Roger and Mary gave Steven a written warning at work concerning making and receiving personal phone calls at work and accessing Jenny's personal email either at home or while at work, and stating that they "must see a marked improvement in [his] behavior within two weeks."  (Greenman Aff. Ex. K.)  Steven was also given a copy of the employee handbook, in which the company policy against

engaging in immoral and unethical activities was highlighted. Roger and Mary suggested, or according to Steven, demanded, that Steven take the four weeks of vacation that he had accrued.

On September 5th, Steven went to Express Images to ensure that his vacation pay was being properly entered. Roger informed Steven that, while on "vacation," Steven was not to be on the company premises. After some argument, during which, according to Steven, Roger reiterated his belief that Steven was a sinner, Steven submitted his resignation.

In early October, Steven became concerned that he would not be able to secure a job offering comparable salary and benefits and determined that he needed to return to Express Images. According to Steven, he decided to leave Holly and return to Jenny in order to appease Roger and Mary and ensure that he would be reinstated. Roger, Steven, and Ryan met to discuss the situation. Ultimately, however, Roger refused to rehire Steven. According to Steven, Roger stated that this was penance for his sins.

Steven asserts that he was subjected to a hostile work environment, resulting in his constructive discharge, on the basis of religion in violation of Title VII and a hostile work environment, resulting in his constructive discharge, on the basis of marital status in violation of the MHRA.

# ANALYSIS

## I.      Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party.  *Id*.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980).  However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial.  *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## II.    Title VII

Ordinarily, a claim of religious discrimination requires the plaintiff to demonstrate that he informed his employer of his particular religious belief and that he suffered an adverse employment action because of the employer's unwillingness to reasonably accommodate that belief. *See Seaworth v. Pearson*, 203 F.3d 1056, 1056 (8th Cir. 2001). However, Title VII has also been found to encompass situations in which an employee suffers an adverse employment action because he or she does not conform to the religious expectations of his or her employer. *See Campos v. City of Blue Springs, Missouri*, 289 F.3d 546, 550-51 (8th Cir. 2002) (upholding jury verdict finding that employee was constructively discharged because she was not a Christian); *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) (recognizing Title VII claim that employee was discharged because she did not measure up to her supervisor's religious expectations); *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) ("Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs."); *Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228 (W.D. Ark. 2002).  In such cases, "the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory;[1] and (3) some additional evidence to support the inference that the

---

[1] Although defendants assert that Steven's job performance had suffered due to the distractions of his marital and extramarital issues, they do not contend that Steven's overall job performance was not satisfactory or that they did or would have terminated Steven because of his performance.

employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." *Shapolia*, 992 F.2d at 1038.

Steven alleges that he was subjected to a hostile work environment resulting in his constructive discharge from his job.  In order to establish a hostile work environment, a plaintiff must show harassing behavior sufficiently severe or pervasive to alter the conditions of his employment.  *Pa. State Police v. Suders*, 124 S. Ct. 2342, 2347 (2004) (internal quotation omitted).   To prove constructive discharge, a plaintiff must further establish that the defendants (1) deliberately made or allowed his working conditions to become so intolerable that he had no other choice but to resign, or (2) should have reasonably foreseen plaintiff's resignation as a consequence of the working conditions that were created.  *Id.*; *Campos*, 289 F.3d at 550.  The plaintiff must demonstrate that a "reasonable person, from an objective viewpoint, would find the working conditions intolerable," and that he took affirmative steps short of resigning to correct the conditions.  *Campos*, 289 F.3d at 550-51.

Steven asserts that Roger and Mary subjected him to repeated and constant commentary, at work, about the wrongfulness and immorality of his personal choices; required him to take time off of work and see a consultant; and refused to evaluate his performance on objective factors.  Furthermore, Steven alleges that Roger and Mary refused his repeated requests that they refrain from commenting on his personal choices; include Jeff (his direct supervisor) in their meetings about his performance; and evaluate him based on established objective criteria.  These conditions eventually led Steven to

ask to be fired.  Additionally, Roger's and Mary's alleged repeated statements to Steven at work that his relationship with Holly was sinful; the emails between Roger and Mary discussing their efforts to have their business conform to Biblical principles; and the emails between Mary and Holly indicate that defendants' objection to Steven's and Holly's relationship, and their related treatment of Steven, was based on their closely held religious beliefs.  The Court finds this evidence, viewed in the light most favorable to Steven, is sufficient to demonstrate a hostile work environment resulting in constructive discharge.  Accordingly, the Court finds that defendants' motion for summary judgment on this claim must be denied.

Roger and Mary insist they did nothing more than request that Steven keep his personal affairs away from the workplace by not supervising Jenny, not having Holly come to the facility, and not taking non-emergency calls from either woman.  According to defendants, Steven responded poorly, insisting that they were judging and meddling in his personal affairs, and demanding to be fired so that he could collect unemployment. Furthermore, defendants assert that they discussed and disciplined him for his failure to fully perform his job because he was too wrapped up in his personal issues, and never brought up their personal religious beliefs as they related to Steven's personal choices.  If credited, this evidence demonstrates that Steven unnecessarily resigned his position without taking reasonable steps to remedy the conflict.  Accordingly, plaintiff is also not entitled to summary judgment on this claim.

### III.    MHRA

Minnesota Statute § 363A.08 prohibits employment discrimination based on marital status.  Minn. Stat. § 363A.08, subd. 2.  "'Marital status' means whether a person is single, married, remarried, divorced, separated, or a surviving spouse and, in employment cases, includes protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse."  Minn. Stat. § 363A.03, subd. 24.

Steven asserts that he was a victim of discrimination based on marital status because he was constructively discharged for being separated and having an extramarital relationship.  Assuming that Steven's version of events is accurate, the Court finds that, as a matter of law, these events do not constitute marital status discrimination.  There is no evidence that Steven was constructively discharged because he was separated or because of the identity of his wife.  Rather, his alleged constructive discharge was because of his presumed sexual relationship with Holly.  In *McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 850 n.10 (Minn. 1985), the Minnesota Supreme Court noted that cohabitation by unmarried persons is not protected under the statute.  In other words, Minnesota law provides that the fact that an unmarried cohabiting plaintiff would not have been terminated if he had been married does not constitute marital discrimination.  Similarly, in this case, that Steven's relationship with Holly would not have been problematic if he were married to Holly or, at least, divorced from Jenny, does not constitute marital status discrimination.  *See also Jacques v. Real Estate Equities, Inc.*, 1991 WL 198451 (Minn. Ct. App. Oct. 8, 1991) (affirming grant of summary judgment

on marital status discrimination claim to employer where employee was fired due to extramarital affair). Accordingly, the Court grants defendants' motion and denies plaintiff's motion with respect to plaintiff's MHRA claim.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' motion for summary judgment [Docket No. 24] is **GRANTED IN PART** with respect to plaintiff's claim of marital status discrimination under the Minnesota Human Rights Act and **DENIED IN PART** in all other respects.

2.    Plaintiff's motion for summary judgment [Docket No. 34] is **DENIED**.

DATED:   September 8, 2005            _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                              United States District Judge